**JOSEPH HORNE CO.**
v.
**UNITED STATES.**
No. 141–54.

United States Court of Claims.
May 7, 1958.

Whittaker, J., dissented.

See also 135 F.Supp. 549, 133 Ct.Cl. 270.

Paul G. Rodewald, Pittsburgh, Pa., George M. Heinitsh, Jr., Pittsburgh, Pa., and David W. Richmond, Washington, D. C., on the briefs, for plaintiff.

John A. Rees, Washingon, D. C., with whom was Charles K. Rice, Asst. Atty. Gen., James P. Garland, Washington, D. C., on the brief, for defendant.

MADDEN and LARAMORE, Judges.

The plaintiff, an operator of a retail department store, claims that it overpaid income and excess profits taxes in the amount of $834,469.11 for its fiscal years ending on January 31 of each of the years 1942 to 1947. The basis of its claim is that it was entitled to, but was denied, the privilege accorded by section 22(d) (6) (A) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 22(d) (6) (A), of deducting from its net income for a given tax year the amount by which the cost of goods bought to refill a depleted inventory exceeded the cost of similar goods as shown in the opening inventory of the tax year. The remarkable thing about the statutory privilege was that it applied even though the replacement goods were not bought until a year or years later. When they were bought, the tax for the earlier year was reopened and recomputed.

The privilege of section 22(d) (6) (A) was granted only to taxpayers who used the "last in, first out" (LIFO) method of taking their inventories. In 1942 the LIFO method was still a fairly recent discovery of the accounting profession. Its advantage was that it showed whether the merchant was currently making any profit on his sales, considering the current cost of replacement of the goods sold. Under the older first in, first out method, he might be making a profit only because he was selling goods which he had earlier bought at a price below the now current price, or having a loss because the earlier bought goods had cost more than the now current price.

The plaintiff, at the end of its fiscal year 1942, took its inventory by the LIFO method. Its reason for doing so was not a tax reason, but the business reason referred to above. In fact, at that time, and until 1948 the Commissioner of Internal Revenue was refusing to approve tax returns of department stores based on LIFO inventories. The plaintiff nevertheless made its returns on that basis for each of the years herein question, and the Commissioner entered into agreements with the plaintiff, for each of those years, extending the time for assessment of taxes, thus keeping the question open. In all those returns, the plaintiff's inventories were on a store-wide basis, and were not broken down into departments or groups of departments. In 1947 the Tax Court of the United States, in the case of Hutzler Brothers Co. v. Commissioner, 8 T.C. 14, held that department stores were entitled to use the LIFO method. The Commissioner in 1948 acquiesced in that decision and changed his regulations to provide expressly how taxpayers using that method should make their inventories.

The Commissioner's 1948 regulations required department store taxpayers to make separate inventories for departments, or groups of departments, and not on a store-wire basis, and to use the index of variations in prices which had been prepared by the Bureau of Labor Statistics of the Department of Labor, or possibly an index made up by a store itself, if the index so made was approved by the Commissioner as correct. The plaintiff reworked all of its inventories for all the years in question, using groups of departments approved by the Commissioner, and using the Bureau of Labor Statistics' index. The plaintiff's returns were then accepted,

and its taxes were adjusted for the several years.

As pointed out at the outset, the plaintiff claims that it should have been accorded the benefits of section 22(d) (6) (A) of the Internal Revenue Code of 1939. Its amended returns filed in 1948 showed that in some of its inventory divisions, i. e. groups of departments, in each of the years, there had been "involuntary liquidation," i. e. the unit had not been able, because of the scarcity of certain goods, to keep its stock of goods up to normal. If that fact had appeared on its original returns, as filed for each of the years, it would have had the privilege of electing, if it thought it advantageous, to accept the privilege accorded by section 22(d) (6) (A).

In making that election, the plaintiff would have had to predict whether, when it would be able to refill its depleted inventories, the cost of the replacement of goods would be more, or less, than the cost of such goods in the year in which the election was made. If the prediction had been that the cost would be greater, it would have been wise to elect to take advantage of section 22(d) (6) (A), since the greater future costs of replacement, carried back into the year of depletion of stocks, would increase the cost of goods sold and thus reduce the taxable profits for that year. If, having elected in a given year to use section 22 (d) (6) (A), it should turn out that prices later went down, the taxes for the year of election would be increased.

As noted above, the plaintiff's returns, filed at the end of each of the years in question, and computing profits on the basis of the LIFO inventory method, made up on a storewide basis, showed no depletion of stocks of goods, "involuntary liquidation," except for the year 1943. The plaintiff could not, therefore, have elected to use section 22(d) (6) (A), except for the year 1943, even if it had felt certain that future prices would be higher. Even for the year 1943, it did not so elect, although it could have done so.

When, in 1948, the plaintiff filed amended returns for all the years in question, which returns used LIFO inventories based on departments rather than on the store as a whole, those returns, as stated above, showed "involuntary liquidations" in some of its departments in each of the years, and by that time it was apparent that, since prices had risen from year to year throughout the period, it would have been advantageous to the plaintiff to have had the benefit of section 22(d) (6) (A). But it could not then, in 1948, make the election, because the section as it then stood required that the taxpayer make its election at the time it filed its return, and the plaintiff's original returns had been filed in each of the years before 1948.

In 1950 Congress by Public Law 756, 81st Congress, 64 Stat. 592, amended section 22(d) (6) (A). It changed the requirement that the election must be made at the time of the return, and said it might be made

"at such time and in such manner and subject to such regulations as the Commissioner * * * may prescribe, * * *."

An important feature of the amendment was that it was retroactive. It was made applicable to any taxable year beginning after December 31, 1940 and before January 1, 1948.

The Commissioner in 1951 amended the regulation applicable to section 22(d) (6) (A) to make it provide that the election under the section might be made within 6 months after filing the return for the year in which the liquidation occurred. This regulation, taken by itself, would have nullified the retroactivity of the amendment to the statute. However, there was in effect a general regulation to the effect that in any case where an election by a taxpayer is provided for, the Commissioner might, upon application, extend the time for making the election.

The plaintiff says that (1) the Commissioner's six months regulation was invalid because it nullified the statute and

(2) even if the regulation was valid, the Commissioner's action in refusing to extend the plaintiff's time for election under the general regulation referred to above was arbitrary and capricious.

█ If Congress by its 1950 amendment intended to re-open all the "involuntary liquidation" situations clear back to 1940, then the Commissioner's six months regulation was contradictory to the statute, as the plaintiff urges. That Congress did not so intend seems clear both from the text of the statute and from its legislative history. The statute placed with the Commissioner the power to determine when the election had to be made. If it had intended to reopen all involuntary liquidation situations, it would merely have set the time for election at some date after the enactment of the statute in 1950. The committee reports spoke of the Commissioner's power to relieve hardships. The intent of Congress was, then, that the Commissioner should, by regulations and action under them, relieve hardships.

As section 22(d) (6) (A) stood before the 1950 amendment, the Commissioner had no power to extend the time for making the election. The statute said the election must be made at the time the return was filed, and that ended it. But the 1950 amendment and the six months regulation brought the situation within the terms of the general regulation reserving to the Commissioner the power to extend the time for making any election.

█ The plaintiff's case, then, must rest upon its claim that the Commissioner was arbitrary in not extending the plaintiff's time for making its election. Congress would not have intended that the Commissioner could, without reason or policy, extend or refuse to extend the time of election for individual taxpayers. A grant of such an arbitrary power to an executive officer is not to be assumed. If then, the statute was not to be, on the one hand, a grant of arbitrary power to the Commissioner, or, on the other hand, a nullity, Congress must have had some idea of what would be a hardship, which the Commissioner was expected to relieve. Our only evidence of what that idea was is in the committee reports, which said:

"Present law provides that, in order to have the advantage of such a tax recomputation, the taxpayer must elect to have these provisions apply 'at the time of the filing of the taxpayer's income tax return' for the year in which the inventory liquidation occurred. However, in some cases taxpayers did not know, at the time the return was filed, that it would be to their advantage to make such an election. For example, there are cases where, at the time of a subsequent investigation of the return, *Government agents have segregated into two groups or classes an inventory which the taxpayer considered as consisting of only one class of items.* As a result of this segregation it is now held that a liquidation of the inventory of one class of items occurred, although there was no decrease in the number of both classes combined. It is held that, not having made a timely election, the taxpayer cannot apply the excess cost of replacing these items in a subsequent year to reduce the tax for the year in which the liquidation occurred. [Italics supplied.]" [S.Rep. 2366, 81st Cong., 2d sess.]

As shown in finding 20,* the Commissioner, in administering the amended

---

\* "20. The policy of the Commissioner, in considering application of taxpayers under subpart H of Regulations 111 for extensions of time within which to elect the involuntary liquidation and replacement provisions, is to grant relief where the failure to make a timely election was due to (1) a reasonable and bona fide mistake of fact which made it appear that taxpayer was ineligible to make such election until the time within which such election might be made had expired, or (2) a change of position by taxpayer in reasonable reliance on an erroneous action or representation by the Commissioner which made taxpayer ineligible to

statute, gave relief to a rope manufacturing company which, in its returns, showed a single inventory of fiber including both manila and sisal. This inventory showed no "involuntary liquidation" hence the taxpayer could not have, and did not, claim the benefits of section 22 (d) (6) (A). The Commissioner, upon examining the return, established separate inventories for manila and sisal, and the manila inventory showed an involuntary liquidation. The taxpayer claimed the benefits of section 22(d) (6) (A). The Commissioner concluded that it was a hardship case, extended the time for making the election, and granted relief.

The plaintiff says that its situation is like that of the rope manufacturer, and is covered by the thought expressed in the committee reports. It used a store-wide inventory which showed no involuntary liquidation except in the year 1943; it was required by the Commissioner to break down its inventory according to departments; the breakdown showed involuntary liquidations; it was too late to elect to take advantage of section 22 (d) (6) (A), as it then stood.

The Government says that if the plaintiff gets relief, it gets the benefit of hindsight, which a taxpayer whose current returns showed involuntary liquidations did not get. Those taxpayers, in electing, had to take the chance of whether future prices would go up or down. The plaintiff, in electing in 1951, took no chances. It knew just what had happened to prices in the years in question.

Congress must have known, when it passed the 1950 amendment, retroactive to 1940, that anyone who got any benefit from the amendment would have, when he made his election, the benefit of hindsight. The rope manufacturer who was granted relief by the Commissioner, of course, had the benefit of hindsight. If prices had not gone up in the meantime, he would not have asked for relief. There is nothing in the hindsight argument, if the amendment was to have any effect at all.

The Government says that the plaintiff knew, during all the years in question, what the trend of prices was in its different departments, although it was filing its returns on a store-wide basis. It says that the plaintiff had in its hands trade publications showing the percentages by which prices in the various departments of a department store had increased, and must have known that if it had broken down its inventory by departments, some departments would have shown involuntary liquidations. It will be remembered that during these years the Commissioner was taking the position that department stores could not use LIFO at all, whether store-wide or by departments. That being so, there was no reason why the plaintiff should make its original returns on a departmental basis, though the Commissioner ultimately, in 1948, required it to do so. The fact that the trend of prices, by departments, would be and was well known to a prudent storekeeper would not tell him whether the stock of goods in a particular department was depleted to the point of an involuntary liquidation, when he was making his inventory on a store-wide basis.

The Government says that it is apparent that the plaintiff, until it had the benefit of the hindsight available to it in 1951, never would have taken the chance of electing to come under section 22(d) (6) (A). If it were possible to con-

make such election within the time required.

"An example of a situation coming within this policy is the case of a rope manufacturing company which, in good faith and with reasonable cause, reported a single fiber inventory in which it included both manila and sisal. It used the LIFO inventory basis. Because its single fiber inventory showed an increase, it did not elect to have the involuntary liquidation and replacement provisions of Section 22(d) (6) apply. The Commissioner examined the return, determined that the fiber clasification was too broad, and established separate inventories for manila and sisal. The new manila inventory reflected an involuntary liquidation. The Commissioner determined that the requisite basis for relief existed."

struct an answer to that hypothetical question, it might well be that the Government's contention is correct. The Government's evidence is that in 1943, when the store-wide inventory showed involuntary liquidation, the plaintiff did not elect to come under the statute, and that for the year 1948, not here in question, the plaintiff's original returns showed departmental involuntary liquidations, yet the plaintiff did not elect to come under the statute. Since plaintiff had an opportunity to elect under section 22(d) (6) (A) for 1943 and failed to exercise this right, we think it is not now entitled to the benefits of Public Law 756 for that year. However, if the amendment of section 22(d) (6) (A) was not a futile gesture of Congress, it would seem to have granted the plaintiff a right to relief for the years 1942, 1944, 1945, 1946, and 1947 in which plaintiff suffered involuntary liquidations that were not apparent until after the then existing time for statutory election had expired.

At the hearing before a trial commissioner of this court, testimony was limited to the issue of whether or not the plaintiff is entitled to relief, as provided for by Public Law 756, 81st Cong., 64 Stat. 592, which amended section 22(d) (6) (A), *supra;* that is to say, whether the plaintiff's elections to invoke the provisions of section 22(d) (6) (A), *supra,* were filed within time. The extent of any involuntary liquidations within the meaning of section 22(d) (6) (A) was reserved for later determination under Rule 38(c) of this court, 28 U.S.C.A.

Plaintiff is entitled to recover for the years 1942, 1944, 1945, 1946, 1947 together with interest thereon as provided by law, and judgment will be entered to that effect. The amount of recovery will be determined pursuant to Rule 38 (c) of the Rules of this court.

It is so ordered.

JONES, Chief Judge, and LITTLETON, Judge, concur.

WHITAKER, Judge (dissenting).

Plaintiff sues to recover an alleged overpayment of income, declared value excess profits, and excess profits taxes for the years 1942 to 1947, inclusive, in the amount of $834,469.11, with interest as provided by law.

Plaintiff alleges that the Commissioner of Internal Revenue unlawfully deprived it of its right to elect to value its inventories for each of the taxable years on the basis of the replacement cost of the items therein, which had been liquidated involuntarily during each of the taxable years, as authorized by section 22(d) (6) of the Revenue Act of 1939, as amended.

The Internal Revenue Act of 1939, before it was amended on September 5, 1950, by Public Law 756, *supra,* provided that were items in a taxpayer's inventory had not been replaced because of its inability to do so, the taxpayer might elect to value them on the basis of the cost of replacement, if they were actually replaced in a later year and prior to 1951. However, this election had to be made at the time of the filing of the taxpayer's original return.

When plaintiff filed its returns it did not make an election to use replacement costs, because it says its then method of taking its inventory did not disclose any involuntary liquidation during any of the taxable years, except the year 1943. As to this year, although involuntary liquidations were disclosed, plaintiff says it did not make the election, because it did not think it would be to its advantage to do so.

But after the passage of Public Law 756, plaintiff did make an election to value its inventories on the basis of replacement cost of the items as to which there had been an involuntary liquidation. It contends that it made this election within the time contemplated by Public Law 756. The defendant contends that it did not.

Public Law 756 was passed long after the close of each of the taxable years in question. It nevertheless permitted a

taxpayer to elect to use replacement cost in valuing its inventories for any taxable year "beginning after December 31, 1940, and prior to January 1, 1948." It was, therefore, applicable to the taxable years in question. However, this election had to be made "at such time and in such manner and subject to such regulations as the Commissioner with the approval of the Secretary may prescribe."

The Commissioner's regulations under Public Law 756, issued on May 22, 1951, required that the election should be made within six months from the time the original return was filed. This period, of course, had elapsed for each of the taxable years in question long prior thereto. The regulation did provide, however, that the taxpayer might request an extension of time within which to make the election. This taxpayer did request an extension of time, but this was denied by the Commissioner.

The taxpayer alleges (1) that the Commissioner's regulation, as applied to a case such as taxpayer's, is invalid, because contrary to the legislative intent expressed in Public Law 756; and (2) that the Commissioner's denial of plaintiff's request for an extension of time was arbitrary, and defeated the legislative intent as expressed in Public Law 756. That legislative intent, plaintiff says, was to relieve a taxpayer who had been deprived of the privilege of making the required election when it filed its original return. It says that its case comes within the situations which the committee reports show Congress intended to take care of.

The report of the Senate Finance Committee, which is substantially the same as the report of the House Ways and Means Committee, does show that Public Law 756 was intended to relieve taxpayers of a hardship which they may have suffered from the requirement of making an election at the time of the filing of the original return. As an illustration of the hardship which Public Law 756 was intended to correct, the Senate Committee report states:

"* * * However, in some cases taxpayers did not know, at the time the return was filed, that it would be to their advantage to make such an election. For example, there are cases where, at the time of a subsequent investigation of the return, Government agents have segregated into two groups or classes an inventory which the taxpayer considered as consisting of only one class of items. As a result of this segregation it is now held that a liquidation of the inventory of one class of items occurred, although there was no decrease in the number of both classes combined. It is held that, not having made a timely election, the taxpayer cannot apply the excess cost of replacing these items in a subsequent year to reduce the tax for the year in which the liquidation occurred.

"This bill provides that the taxpayer can make the required election 'at such time and in such manner and subject to such regulations as the Commissioner with the approval of the Secretary may prescribe.' Since the amendment is retroactive to taxable years beginning after December 31, 1940, the Commissioner of Internal Revenue can provide relief in any case which appears to involve hardship." [S.Rep. 2366, 81st Cong., 2d Sess. See also H.Rep. No. 2756, 81st Cong., 2d Sess.]

Plaintiff says that its method of taking its inventory did not disclose any involuntary liquidations of items in its inventory, and that it did not discover that there had been such liquidations until after it had taken its inventory in accordance with the regulations of the Commissioner of Internal Revenue, which had been adopted after the decision in Hutzler Brothers Co. v. Commissioner, 8 T.C. 14. These regulations required that inventories of department stores using the LIFO (last in first out) method should be taken on a departmental, instead of on a storewide basis. Before the promulgation of the regula-

tions, plaintiff had taken its inventories on a storewide basis. This method, it says, did not disclose involuntary liquidations, because liquidations in some departments were offset by increases in others. Its ignorance of the fact of involuntary liquidations, it says, excuses it for not having made the elections at the time it filed its returns, and that Public Law 756, *supra*, entitled it to make the elections at the time it did, which was in 1951.

When plaintiff filed its original returns, it did not have the benefit of any regulations of the Commissioner of Internal Revenue respecting the taking by department stores of inventories on the LIFO method, because, during all of the taxable years in question, the Commissioner of Internal Revenue took the position that a retail department store was not entitled to take its inventories on the LIFO basis. However, the Tax Court in Hutzler Brothers Co. v. Commissioner, supra, in January 1947, held that the Commissioner's position was erroneous, and that a retail department store was entitled to take its inventory on this basis. The Commissioner, however, did not amend his regulations so as to permit this until March 4, 1948, after plaintiff had filed all the returns here involved.

Not having the benefit of any regulations by the Commissioner of Internal Revenue governing the taking of an inventory by a department store on the LIFO basis, plaintiff was obliged to use its own judgment on how to take it. It adopted the Fairchild Total Store Price Index, and took its inventory on a storewide basis. This disclosed a liquidation only in 1943, as stated hereinbefore.

When the Commissioner of Internal Revenue amended his regulations permitting a retail department store to use the LIFO method, he required it to take its inventory, not on a storewide basis, as the taxpayer had done, but on a departmental basis, and he further required it to use the Bureau of Labor Index, instead of the Fairchild Total Store Retail Price Index, which taxpayer had used.

The Fairchild Total Store Retail Price Index applied the same percentage of increase or decrease to all items in the inventory for the entire store, whether they were cosmetics, carpets, alarm clocks, or what-not.. The Bureau's regulations required the use of an index for each department or group of departments of the store, and it required the use of the Bureau of Labor Index, or an acceptable index prepared by taxpayer, rather than the Fairchild Index.

After the Commissioner of Internal Revenue had issued his regulations on March 4, 1948, permitting inventories on the LIFO method, the taxpayer recomputed its inventory. Then, for the first time, it says, it discovered that there had been involuntary liquidations. However, it did not at that time elect to use replacement cost in valuing the items as to which there had been involuntary liquidations, because, it says, under the law as it then was, the time for the making of this election had long since expired, the law at that time requiring that the election be made when the original return was filed.

Hence, this taxpayer says it never knew there had been involuntary liquidations as to certain items in its inventory until long after the time had expired within which it was permitted to make an election to use replacement costs. It says it never had a chance to make the election until the passage of Public Law 756. It says this law was intended to give taxpayers in such situations the opportunity to make the election.

However, the Commissioner's regulations issued under this law required the making of an election six months after the return had been filed. Since this time had long since run as to all the returns, the taxpayer filed an application for an extension of time, as it was entitled to do under the regulations. This was done on August 8, 1951, which was about two and one-half months after the issuance of the Commissioner's regulations. This request for an extension of time was denied. Plaintiff says it was.

entitled to the extension as a matter of law.

Public Law 756 was not intended to give all taxpayers the right to make an election to use replacement cost. It provided that the election should be made "at such time and in such manner and subject to such regulations as the Commissioner with the approval of the Secretary may prescribe." Under this provision, large discretion was undoubtedly vested in the Commissioner in prescribing the circumstances under which the taxpayer might make such an election, but this discretion, of course, had to be exercised by the Commissioner reasonably, and in such way as to carry out the intent of Congress in the passage of Public Law 756—certainly not in a way to thwart that intent.

I am of opinion that regulations requiring the making of an election at a time long since passed when the regulation was promulgated did thwart the will of Congress. But the regulations provided for the granting of an extension of time, upon application of a taxpayer. If the extension was granted, so as to permit the making of the election, of course such a taxpayer could not complain of the unreasonableness of the regulation. It is only those taxpayers who were entitled to an extension and who were denied it who can complain. Those taxpayers who were entitled to an extension were those taxpayers who were entitled to make the election. The question then is: Was the plaintiff entitled to make the election after the passage of Public Law 756?

As the Senate Report shows, the law was intended to give the Commissioner of Internal Revenue authority to give relief to a taxpayer "in any case which appears to involve hardship."

If plaintiff, through no fault of its own, had been unable to discover the involuntary liquidations until after the Commissioner of Internal Revenue had amended his regulations in 1948, then I think plaintiff would present a case of hardship; but such is not the case.

Prior to the fiscal year ending January 31, 1942, plaintiff had taken its inventories on a departmental basis, using the FIFO (first in first out) method. But in this year it determined to use the LIFO method and to take its inventories on a storewide basis, instead of a departmental basis. Such an inventory disclosed no involuntary liquidations. Although there had been involuntary liquidations in some departments, these liquidations were offset by increases in others. For this reason plaintiff did not know that there had been involuntary liquidations, and, hence, it says there was no occasion for it to make an election to value its inventories on replacement cost.

However, at the time plaintiff adopted the storewide basis, and the use of the Fairchild Index, there was then available to it the index prepared by the National Industrial Conference Board, which had been prepared at the direction of the National Retail Dry Goods Association, to which association plaintiff belonged. This index was prepared on a departmental basis, and showed price changes by separate departments for a typical department store. Had this index been used, it would have disclosed involuntary liquidations in some of the departments of the store.

Since this index was available to plaintiff at the time it filed its income tax returns for each of the taxable years in question, and at the time it changed to the LIFO method of valuing its inventories, and since it would have disclosed involuntary liquidations, it was possible for plaintiff to have discovered whether or not there had been involuntary liquidations in any of its departments. In order to shift from the FIFO to the LIFO method, plaintiff was not obliged to abandon its former method of taking its inventories by departments and shift to the storewide inventory. Had it not done so, it would have discovered the involuntary liquidations. It was the shifting from the departmental to the storewide basis that prevented plaintiff from discovering the liquidations.

This shifting was not forced on plaintiff; it was its own voluntary act. Had

it made this discovery, it would then have been under the obligation to decide whether or not to make an election to value liquidated items at replacement cost, and to make this election when it filed its returns.

Hence, plaintiff's ignorance of the fact that there had been involuntary liquidations was due to its own choice in adopting the Fairchild Total Store Retail Price Index, instead of the departmental index prepared by the National Industrial Conference Board at the instance of the National Retail Dry Goods Association.

For this, no one is responsible except the plaintiff. The Commissioner of Internal Revenue had nothing to do with its making this selection. The Commissioner was then taking the position, it is true, that a retail drygoods store was not entitled to use the LIFO method at all. This was erroneous, of course, but it had nothing to do with plaintiff's decision to use the Fairchild Total Store Retail Price Index, instead of a departmental index prepared by the National Industrial Conference Board.

2. When plaintiff took its inventory for the fiscal year ending January 31, 1943, involuntary liquidations were disclosed, even on the basis of taking the inventory on a store-wide basis; but plaintiff did not then make the election to value its inventories on the basis of replacement cost. Certainly it was under the obligation to make this election as to this particular year when it filed its returns for that year. Plaintiff says it was not then obliged to make the election because it did not then know that it would be to its advantage to do so. This is no excuse. No taxpayer could be certain whether or not it would turn out to be to its advantage to elect to value its inventory on the basis of replacement cost. Whether or not it would be to its advantage depended upon whether prices in the future rose or fell. If they rose, it would be to its advantage; if they fell, it would be to its disadvantage. This was a risk every taxpayer had to take, and the Act expressly provided that an election once made was irrevocable. A taxpayer was not entitled to wait until he could determine whether or not it was to his advantage to make such an election; he had to take the risk of making it or not at the time his return was filed.

Public Law 756 was not intended to give taxpayers the benefit of hindsight; it was only intended to relieve them from a hardship, for which they were not responsible, a hardship which prevented them from making the election at the time of filing their returns.

3. At the time plaintiff filed its amended returns under the regulation promulgated by the Commissioner of Internal Revenue, after the decision of the Tax Court in Hutzler Brothers Co. v. Commissioner, supra, it then discovered that there had been involuntary liquidations in some of its departments, but at that time it did not undertake to elect to value its inventory on a replacement basis. It says it did not, because the law then in force required that this election be made when the original return was filed. However, it would seem that since the Commissioner of Internal Revenue did not recognize the right of a taxpayer to take its inventory on a LIFO basis when plaintiff filed its original returns, plaintiff might well have taken the position in its amended returns that it was then entitled to make the election; but it did not do so. I do not mean to say the plaintiff was entitled to do so, but that it would have been plausible for plaintiff to have urged that it was. Other department stores did so. See Louis Pizitz Dry Goods Co. v. Deal, 5 Cir., 208 F.2d 724.

At the same time plaintiff filed these amended returns for 1942 to 1947, inclusive, it also filed its original return for the fiscal year ending in 1948. This return showed very large involuntary liquidations, but plaintiff did not, as to this year, elect to value the liquidated items on a replacement basis.

From its failure to make the election as to 1943, for its failure to do so when it filed its amended returns, and also

when it filed its return for 1948—from this it would appear that plaintiff never intended to make this election; that it was never willing to take the risk involved in making the election. Had it made the election and prices had declined in subsequent years, plaintiff's income would have been increased rather than decreased, and plaintiff apparently was unwilling to take this risk.

I am of opinion that Public Law 756 did not give plaintiff the right to make an election to use replacement costs, under all the circumstances of this case. See Huron Milling Co. v. United States, 130 F.Supp. 818, 131 Ct.Cl. 733.

I would dismiss plaintiff's petition.

**ENTERPRISE RAILWAY EQUIPMENT COMPANY**

v.

**UNITED STATES.**

No. 484–56.

United States Court of Claims.

May 7, 1958.